[Civ. No. 5287.   Third Appellate District.—January 18, 1935.]

CHRISTIAN A. KNICKRIHM, Respondent, v. JOHN HAZEL, Appellant.

[Civ. No. 5288.   Third Appellate District.—January 18, 1935.]

FRANK PIOLA, Respondent, v. JOHN HAZEL, Appellant.

Barry J. Colding, Theodore Hale and Carroll B. Crawford for Appellant.

Bradford, Cross & Prior for Respondents.

PLUMMER, J.—This cause is before us. upon motion of the respondents either to dismiss the defendant's appeals, or to affirm the judgments.

Two personal injury actions were begun, one by the plaintiff, Knickrihm, and one by the plaintiff, Piola, arising out of the same action, were consolidated for trial, are presented upon one transcript, and argued upon one set of briefs.

The record shows that on the evening of October 30, 1933, the plaintiffs were riding in an automobile as guests of the defendant, John Hazel. Accompanying the party was a

fourth person named George Olsen. The car in which the party was riding was owned and was being driven by John Hazel in a southerly direction from the city of Sacramento, along what is known as the Riverside or "Pocket" road, which is a loop road by which, in a drive of some 15 to 16 miles, one can, by making the loop, return to the city of Sacramento. That at a curve in the road about 8 miles from the city of Sacramento, the automobile left the highway, went through a fence into a field, and turned over at a point distant from the highway from 100 to 125 feet. George Olsen was killed. The plaintiff Knickrihm was severely injured, and was awarded a judgment in the sum of $10,000. Piola was less seriously injured, and was awarded a judgment in the sum of $2,000. The liability of the defendant is based upon the alleged intoxication of the defendant while driving the automobile at the time of the injuries suffered by the respective plaintiffs.

From the judgments in favor of the plaintiffs the defendant appeals.

No exception is urged that the awards of damages are excessive, the real contention being that the evidence is insufficient to establish the fact of intoxication on the part of the defendant, and as a minor objection that the plaintiffs were guilty of contributory negligence in accepting a ride with the defendant. The trial was had before the court sitting without a jury.

The record really presents only a conflict of evidence. If the evidence introduced by the defendant had been accepted by the court as a correct statement of the circumstances, then and in that case the plaintiffs should have been awarded nothing by reason of their actions. However, the court did not do so, and if the record shows sufficient testimony introduced by the plaintiffs to sustain the findings of the court, then, instead of dismissing the appeal, the judgment should be affirmed.

All four of the participants in the ride in the accident were employees of the Del Paso Country Club and were well acquainted with one another. The testimony set out in the plaintiffs' brief, and also a reference to the transcript, shows that there is sufficient evidence to justify the court in concluding that the defendant imbibed at least one drink

of gin, four highballs and four glasses of beer during the late afternoon and evening, a short time preceding the accident. It appears that the defendant and George Olsen had a drink of gin at the country club, which is a few miles distant from the city of Sacramento. On their way to the city of Sacramento they stopped at a place known as the "Oasis", and had a drink of beer. Coming into Sacramento they stopped at 517 K Street, characterized in the testimony as being a "bootlegging joint", engaged in rolling dice; were thereafter joined by a witness by the name of Perelli, and had several drinks of intoxicating liquor described as "highballs".

During the time that the defendant Olsen, and the witness Perelli, were rolling dice and drinking highballs, the plaintiff Piola, entered the same place for the purpose of getting his dinner, and took a seat at the bar or counter a few feet away from the parties we have just mentioned, sitting with his back partly toward the defendant, Olsen and Perelli. He testified, however, that he observed highball glasses on the bar in front of the defendant, but did not testify as to the number of drinks taken by the defendant, or by Olsen or Perelli. Shortly after 7 P. M. all of the parties left the bootlegging joint with the intention of going to a show. Hazel, however, invited the plaintiff Piola and Knickrihm, who it appears had arrived at 517 K Street, but was standing outside on the sidewalk, to drive over to a gambling joint in Yolo County, the plaintiffs objecting at first, stating that they wanted to go to a show. The defendant, however, it appears, stated that he was driving back to the Sacramento side of the river in time for the plaintiffs to go to a show. Getting into the car Hazel drove the parties over to the gambling joint on the Yolo side of the river, but when arriving there it appears that the party agreed not to enter the gambling joint. Just how long a time was consumed after leaving 517 K Street before the parties returned to the Sacramento side of the river, does not appear. However, after concluding not to enter the gambling joint, Hazel drove the car across what is called the "M Street Bridge", over the Sacramento River to the Sacramento side, but instead of driving toward the city of Sacramento, turned

southward and started on the drive which terminated in the accident and the injuries to the plaintiffs upon which this action is based.

After leaving the city of Sacramento and driving southward the plaintiffs observed that Hazel was driving in what they called a reckless manner; requested Hazel to stop and let them out of the car. Instead of stopping and letting them out of the car, Hazel told the plaintiffs to get out, and continued to drive in the same manner, one of the witnesses testifying that the car swayed from side to side as it was driven around the curves. One of the witnesses testified as follows: "I always beg him to stop; I say, 'Let me go out.' 'Well,' he say, 'go out if you want to,' but he didn't stop the car so I couldn't get out; I have to sit right there. Q. After leaving the city limits did you again say anything to him? A. Oh, I told him, I say, 'Let me out,' I say, 'I will walk back,' and he laughed at me there, that is all, just laugh at me. Q. Do you recall in traveling that road that there were a great number of curves? A. Oh, I saw he made the curve there, I know one curve he made before the accident the wheels just come up like that, 'Oh,' I say, 'My gosh,' I say, 'slow up, slow up! Let me out.' I say, 'I walk back to town,' but he won't do it, he just keep on going. Q. Did he slow down when he reached those curves, or not? A. No, he don't slow down, he just laughed at me, that is all. Q. Now, just before the car left the road, do you know whether or not that was on a curve? A. Well, I see when he came around the curve, and I know right away, he was just coming right like that, and the car went up, and I don't remember nothing else at all."

The road on which the parties were riding was one of many curves, and while the appellant argues that the testimony does not show an excessive rate of speed, the defendant's own statement is to the effect that at the place of the accident he was driving between 40 and 45 miles per hour.

The plaintiff Knickrihm knew nothing of the drinking on the part of the defendant prior to the accident. The plaintiff Piola had some knowledge of the defendant's drinking, but testified that he did not become conscious that the defendant was intoxicated until he began driving recklessly

out of the city of Sacramento, and down along what is called the "Pocket Road", and that he also asked the defendant to slow up, and with the plaintiff Knickrihm, desired to leave the car.

The court had ample reason to conclude that when the parties entered the car driven by the defendant, he stated he would, on returning from the Yolo side of the river, leave his guests in the city of Sacramento in order that they might attend a show, but on the contrary, without asking their permission or saying anything to them regarding his purpose, started on a drive southward from the city, and drove in the manner as testified to by the plaintiffs. Within a few days after the accident the defendant told the witness Titus, of the kind and number of drinks which he had had, and the places where the drinks had been obtained, including in the statement a mention of taking a drink of gin, and also of a few highballs. Upon the witness stand the defendant denied that he had drunk anything but beer. Two other witnesses testified that the defendant's face was flushed, one testifying that he smelled what he thought was gin on the breath of the defendant.

The testimony of the defendant relative to the cause of the accident, is to the effect that the car seemed to get out of control. We here quote that part of his testimony: "Q. Just before your car went off the road for the last 200 feet, let's say it traveled anywhere from 140 to 150 feet after it went off the road; so taking a point back for 10 feet or 20 feet, just before it went off the road, was there anything unusual about the car? A. Well, the car seemed to be out of control, I could feel a pulling to the right; the wheels didn't respond to the steering wheel. Q. Well, what did you do? A. Well, I turned the steering wheel as far as I could, and that is all I could do. Q. And did the road wheels respond to it when you turned it? A. No, I had the impression that the road wheels did not respond to the steering wheel. Q. Had you then made the curve already? A. I am not quite positive, but I would say that I was at the end of the curve when I noticed this."

The defendant also testified that the car was in good condition. There was also testimony to the effect that the plaintiffs thought the defendant was acting "funny" after

he started driving southward from the city of Sacramento. The defendant also testified that there were a great many curves in the road, two of them complete right-angle turns.

The defendant introduced the testimony of ·two deputy sheriffs and an interne at the county hospital, to the effect that they saw the defendant a short time after the accident, and that the defendant was not intoxicated.

Following the summary of the testimony the appellant argues that there is a distinction between section 112 and section 141¾ of the California Vehicle Act, where in the former section it is made a penal offense for one to drive an automobile while under the influence of intoxicating liquor; and in the latter, allowing the recovery by a guest when the accident in which the guest is injured results from the intoxication of the driver.

Without attempting to draw a line of demarkation between the legal meaning of the words "under the influence of intoxicating liquor", and "resulting from intoxication", we will consider the circumstances presented in this case in the light of the conclusion of the trial court that the defendant had reached that condition known as "intoxication".

One of the definitions found in Webster's International Dictionary of the word "intoxicated" reads as follows: "Affected by an intoxicant; under the influence of an intoxicating liquor or drug." And the definitions of the word "intoxicate" as an adjective are by the same work: "Intoxicated; inebriated; drunk; over-excited; transported" etc. Also, "Intoxicated" is defined as: "emotionally wrought up".

This court, in the case of *Jones* v. *Pacific Gas & Electric Co.*, 104 Cal. App. 47 [285 Pac. 709], had occasion to inquire into the meaning of the term "intoxicated", and therein approved the definition found in *Jensen* v. *Chicago etc. Ry. Co.*, 133 Wash. 208 [233 Pac. 635], where it is in substance said: "One is intoxicated when he is under the influence of an intoxicating liquor to such an extent as to dull his sense of sight, and to prevent, or tend to prevent him from exercising the care and caution which a sober and prudent man would have exercised under the circumstances."

Following this definition this court added the following: "The statute applies if the intoxication is to such a degree

as to prevent or tend to prevent the driver of an automobile from exercising his normal faculties, and driving with the care and caution characteristic of a sober and prudent person.''

■ We also cited a number of authorities in the opinion in that case to the effect that when one gets into an automobile which is being operated by a drunken driver, he is guilty of contributory negligence to such a degree as to bar recovery if any injury results from the negligent driving of the drunken driver. In this connection we may properly call attention to the case of *Anderson* v. *Pickens*, 118 Cal. 212 [4 Pac. (2d) 794], where it is said in substance that in order to charge one injured, with contributory negligence in riding with a drunken driver, he must have had reasonable opportunity to alight from the automobile after becoming aware of the intoxicated condition of the driver. In the instant case the testimony which we have set forth shows that the driver declined to permit the plaintiffs to alight from the automobile, and kept on driving in a manner which aroused their fears, even though requested to allow the plaintiffs to alight from the automobile.

■ The vital question in this case is as to whether the testimony sustains the finding of the trial court that the defendant was intoxicated to such a degree as brought him within the definitions above stated. The testimony to which we have referred shows the drinking of a number of glasses of intoxicating liquor. Just what kind of beer was partaken of at the bootlegging joints is not explained, but there is testimony justifying the court in the conclusion that the defendant took a number of drinks of intoxicating liquor. We find the defendant's face was flushed after 4 P. M., indicating the drinking of some kind of liquor; we find him coming to Sacramento, stopping on the way to get another drink, presumably of beer; going to a bootlegging joint at about 5:30 P. M., and remaining there until after 7 P. M., rolling dice and drinking highballs, leaving there, going over to a gambling joint in Yolo, returning with his guests who desired to go to a show, but instead of turning toward the center of the city, proceeding in a southerly direction over a very crooked highway, driving, by his own testimony, at the time of the accident, at a speed of from

40 to 45 miles per hour. The plaintiffs, becoming aware of the condition of the driver, requested an opportunity to alight, and were answered only with a laugh. Shortly, the automobile, in the language of the defendant, "went out of his control", left the highway, and overturned. Does this constitute evidence of intoxication, and justify the conclusion that the injury suffered by the plaintiffs resulted from the intoxication of the driver?

In *Hasten* v. *State*, 35 Ariz. 427 [280 Pac. 760], the Supreme Court of Arizona had occasion to pass upon one of the elements involved in this action. We quote the following from the opinion: "There are three assignments of error. The first raises the question of the admissibility of certain evidence as to the speed at which the appellant was driving when arrested. It is urged that the speed of his car has no connection with the particular offense charged. We cannot agree with this contention. It is a notorious fact that one of the first things a driver under the influence of intoxicating liquor is apt to do is to drive at a high rate of speed, especially when an advanced state of intoxication has not yet been reached. Such being the case the speed at which appellant was driving was one of the circumstances which a jury might properly consider in determining whether he was under the influence of intoxicating liquor at the time." (Citing a number of authorities.) The speed at which an automobile is being driven, and whether it is being driven recklessly or is being driven in such a manner as a prudent person would drive under the circumstances, has direct relation to the highway over which the automobile is being propelled. If the highway is wide and straight, a prudent person exercising due care, may properly drive at a high rate of speed without being charged with recklessness or intoxication, but when the car is being driven at the same rate of speed over a crooked highway where there are very sharp turns, the conclusion is necessarily enforced that due caution and prudence are not being used, and taken in connection with the fact that the driver of the vehicle has within a short period of time imbibed a considerable number of drinks of intoxicating liquor, supports the charge that the driver is in an intoxicated condition, and that his loss of control of the car is due to that condition. The

testimony shows that the defendant was in an exceedingly exuberant condition, coming within the definition of "intoxicated" as found in Webster's International Dictionary, as "emotionally wrought up". His replies to the requests of the plaintiffs to be allowed to alight from the car were met only with laughter, which fact points again to the stimulus under which the defendant was acting, and the extent to which his prudence, judgment and caution had been lessened.

In the case of *Tracy* v. *Brecht, ante,* p. 105 [39 Pac. (2d) 498], this court had occasion to examine the authorities touching upon the question of intoxication, the testimony supporting the finding that a driver of an automobile was laboring under such condition, and without extending this opinion by lengthy quotations therefrom, we refer to what is said in the opinion in that case, and approve the same as applicable to the conditions presented here.

The argument is presented in appellant's brief "that two highballs drank between 5:30 and 5:45 could not render any person unfit to drive an automobile at 8 P. M." This argument is not supported by the facts in this case. The defendant in this case, after having had a drink of gin and a drink of beer, entered a bootlegging joint at 517 K Street in Sacramento, after 5 P. M., and did not leave that place (which is also called the "Walnut Bar") until shortly after 7 P. M., during which time the highballs were being drunk. While there is no legal presumption that one is intoxicated because he has taken a drink of liquor, it is within the province of the trial court or the jury to take into consideration the number of drinks of intoxicating liquor which one has imbibed, and his subsequent actions, in determining whether at the time of the accident such person is in fact intoxicated, and if intoxicated to such a degree as hereinbefore defined, to render judgment to that effect.

The question of contributory negligence of the plaintiffs was a matter for the trial court, primarily, and we find nothing in the record justifying any interference with the findings of the court in such particulars.

While this case has been submitted on a motion to dismiss or affirm, it has necessitated a more or less extended examination of the testimony, and is not to be considered

as a precedent for subsequent motions because the court has performed the labor in the examination of the transcript to find the evidence which should have been set forth in respondents' brief. This examination of the transcript, appellant's brief, and respondents' memorandum attached to their motion satisfy us that there is no merit in the appeal for the reason that it involves practically only a conflict in the testimony.

The motion to dismiss the appeals is denied.
The motion to affirm the judgments is granted.
The judgments are affirmed.

Thompson, J., and Pullen, P. J., concurred.

A petition by appellant to have the cause heard in the Supreme Court, after judgment in the District Court of Appeal, was denied by the Supreme Court on March 18, 1935.